## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

HEATHER BORDER,                     )
5160 Crayton Place S.               )
Naples, FL 34103                    )
                                    )        Civil Action No._____
    Plaintiff,               )
                                    )
    v.                       )        JURY TRIAL DEMANDED
                                    )
NATIONAL REAL ESTATE ADVISORS, LLC  )
900 Seventh Street, NW, Suite 600   )
Washington, DC 20001                )
                                    )
    Defendant.               )
_____)

### COMPLAINT

Plaintiff, Heather Border ("Plaintiff" or "Ms. Border"), brings this action against National Real Estate Advisors, LLC ("Defendant" or "NREA") to seek redress for willful violations of the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"); the Pregnancy Discrimination Act, 42 U.S.C. § 2000e *et seq.* ("PDA"); the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"); the D.C. Human Rights Act, D.C. Code § 2-1401.01 *et seq.* ("DCHRA"); the D.C. Family and Medical Leave Act, D.C. Code § 32-501 *et seq.* ("DCFMLA"); and the Protecting Pregnant Workers Fairness Act of 2014, D.C. Code § 32-1231.01 *et seq.* ("PPWFA").

Defendant interfered with Ms. Border's right to use protected family and medical leave and discriminated, harassed, and retaliated against Ms. Border based on her pregnancy, childbirth, requests for accommodations, and the exercise of her right to use protected family and medical leave.  Specifically, after Ms. Border requested accommodations due to pregnancy-related complications, and immediately after she returned to work full-time following her use of

1

family and medical leave after the birth of her son, Defendant failed to compensate her as previously agreed upon, demoted her, and diminished her duties and responsibilities in violation of the ADA, FMLA, Title VII, PDA, DCHRA, DCFMLA, and PPWFA.  Defendant's harassment and retaliation against Ms. Border escalated after she opposed Defendant's unlawful actions, both informally and by filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and D.C. Office of Human Rights ("DCOHR").  Because Ms. Border engaged in protected activity, Defendant stripped Ms. Border of all meaningful duties, assigned her impossible tasks to complete, excluded her from important meetings and communications, prohibited her from communicating with clients with whom she previously had regular contact, and issued her an unsupported negative performance evaluation.  Ultimately, while Ms. Border was actively pursuing her EEOC charge and less than two months after she notified Defendant that she was pregnant with her third child, Defendant terminated Ms. Border's employment and notified her of the termination during a mediation before the EEOC. Ms. Border seeks to recover back pay, compensatory damages, punitive damages, liquidated damages, consequential damages, attorneys' fees, pre- and post-judgment interest, and any other legal or equitable relief this Court deems just and proper to redress Defendant's unlawful actions.

## JURISDICTION AND VENUE

1.      This Court has subject-matter jurisdiction over Counts I-II, VI-IX, XI-XII, and XIV-XV of this Complaint pursuant to 28 U.S.C. § 1331, as these claims arise under the laws of the United States.

2.      This Court has supplemental jurisdiction over Counts III-V, X, XIII, and XVI-XVII of this Complaint, which arise under the laws of the District of Columbia, pursuant to 28 U.S.C. § 1367(a).

3.    This Court has personal jurisdiction over Defendant because Defendant has

substantial, continuous, and systematic contacts with the District of Columbia and

Defendant's actions and omissions alleged herein occurred in the District of

Columbia.

4.    Venue is proper in the District of Columbia pursuant to 28 U.S.C. § 1391(b)

because Defendant does business in the District of Columbia and a substantial

part of the events or omissions giving rise to the claims asserted herein occurred

in this district.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

5.    On July 20, 2018, Ms. Border filed a Charge of Discrimination ("Initial Charge")

with the EEOC, EEOC Charge No. 570-2018-02951, and cross-filed her charge

with the District of Columbia Office of Human Rights ("DCOHR").

6.    On October 10, 2018, the parties entered into a tolling agreement, tolling the

statute of limitations for all claims under the ADA, Title VII, PDA, DCHRA,

DCFMLA, and PPWFA through and including March 29, 2019.

7.    On November 29, 2018, Ms. Border filed a Charge of Discrimination with the

EEOC alleging that she was subjected to additional acts of retaliation growing out

of the subject-matter of her July 20, 2018 Initial Charge.  The EEOC combined it

with her Initial Charge and treated the November 29, 2018 filing as an

amendment to the Initial Charge.

8.    On February 6, 2019, the EEOC issued Ms. Border a Notice of Right to Sue.

9.    Fewer than 90 days have passed since the issuance of the Notice of Right to Sue.

## PARTIES

10.     Ms. Border is an adult resident of Florida.

11.     Ms. Border worked for Defendant from 2013 to her termination, effective

December 28, 2018.

12.     At all times relevant to this Complaint, Ms. Border was an employee within the meaning

of the ADA, Title VII, PDA, and DCHRA, DCFMLA, and PPWFA.

13.     At all times relevant to this Complaint, Ms. Border was an "eligible employee" within the

meaning of the FMLA and the DCFMLA

14.     Ms. Border was employed by Defendant for at least 12 months prior to requesting

family and medical leave.

15.     Ms. Border worked at least 1,250 hours during the year immediately preceding

her request for family and medical leave.

16.     Defendant is headquartered in Washington, DC and is organized under the laws of

the District of Columbia.

17.     Defendant does business in the District of Columbia.

18.     Defendant is a registered investment advisor with the U.S. Securities and

Exchange Commission that invests in major real estate sectors and manages

approximately $5.6 billion in gross assets.

19.     At all times relevant to this Complaint, Defendant was a covered employer within the

meaning of the FMLA, 29 U.S.C. § 2611(4).

20.     At all times relevant to this Complaint, Defendant was a covered entity within the

meaning of ADA, FMLA, Title VII, PDA, DCHRA, DCFMLA, and PPWFA.

21.     At all times relevant to this Complaint, Defendant was engaged in commerce or in

an industry or activity affecting commerce.

22. At all times relevant to this Complaint, Defendant employed 50 or more employees within a 75-mile radius of its headquarters for each working day during each of 20 or more calendar workweeks in the calendar year preceding Ms. Border's request for family and medical leave.

23. At all times relevant to this Complaint, Defendant employed 20 or more employees who work in the District of Columbia.

24. At all times relevant to this Complaint, Defendant used the services of another individual for pay in the District of Columbia.

## FACTS

25. Ms. Border began her employment with Defendant in 2013 as a Director of Investor Relations.

26. At all times relevant to this Complaint, Jeffrey Kanne, Defendant's Chief Executive Officer, was Ms. Border's first-level supervisor.

27. After her hire, Ms. Border quickly excelled in her position with NREA.

28. In 2014, Defendant promoted Ms. Border to the position of Managing Director of Investor Relations.

29. Defendant promoted Ms. Border as a result of her demonstrated skill, high performance, and ability to foster excellent relationships with prospective investors and clients.

30. As Managing Director of Investor Relations, Ms. Border's position entailed an extensive list of duties and responsibilities including supervising the investor relations team, managing over sixty client accounts, and introducing prospective clients to NREA.

31.     In this role, Ms. Border oversaw all of Defendant's activities related to institutional fundraising and client outreach.

32.     In 2014, Ms. Border moved from Washington, D.C. and began to work remotely full-time.

33.     Thereafter, Ms. Border traveled to Washington D.C. on an as-needed basis for meetings with her team and with Defendant's management.

34.     Mr. Kanne repeatedly praised Ms. Border's outstanding performance throughout her employment.

35.     For example, in a memorandum dated March 16, 2015, Mr. Kanne wrote, "there is no one on staff that could take over [Ms. Border's] duties," and that Ms. Border "has proven to be a hardworking, effective employee."

36.     Similarly, Ms. Border regularly received positive feedback from clients and colleagues.

37.     From the beginning of her employment to September 2018, Ms. Border did not receive any negative performance reviews.

38.     Defendant recognized Ms. Border's positive performance by consistently awarding her bonuses, raises, and promotions.

39.     In January 2016, Mr. Kanne asked Ms. Border to join Defendant's Management Committee, a privilege reserved only for Defendant's most highly valued employees.

40.     As part of the Management Committee, Ms. Border was involved in important management decisions, such as decisions regarding Human Resources policies, employee retention goals, timelines and plans for major upcoming projects and

events, cash management, and the company's overall financial health.  Ms.

Border reported to the Board of Directors and was included in Board of Directors

dinners.

41.    In addition to her promotion to the Management Committee, Defendant offered

Ms. Border a long-term incentive package of $140,000 annually for three years—

2016, 2017, and 2018—to be paid in December 2018.

42.    Defendant awarded a three percent pay increase annually to employees who had a

satisfactory performance.

43.    Between 2013 and 2018, Ms. Border consistently received a three percent merit-

based raise.

44.    In 2017, Defendant awarded Ms. Border a target bonus in an amount equivalent to

her base salary for meeting her 2016 performance goals, in addition to a three

percent pay increase for satisfactory performance.

45.    Throughout her employment with Defendant, Ms. Border accomplished many

significant achievements, including prospecting new investors and solidifying

relationships with current investors.

46.    In March 2017, Ms. Border informed Defendant that she was pregnant.

47.    Ms. Border's medical providers diagnosed her pregnancy as "high-risk" because

she experienced pregnancy-related complications, including that her baby was

experiencing intrauterine growth restrictions during her third trimester, and

because during her previous pregnancy with her firstborn, she had placenta

accreta and  had suffered a large blood clot in her uterus due to a previous

miscarriage.

48.    In July 2017, Ms. Border's treating medical providers placed her on travel

restrictions because of her medical diagnosis related to her high-risk pregnancy,

including her intrauterine growth restrictions.

49.    Ms. Border informed Mr. Kanne and Human Resources about her pregnancy-

related medical conditions.

50.    Mr. Kanne and Human Resources were aware of Ms. Border's pregnancy-related

complications with her firstborn and that she had previously experienced a

miscarriage.

51.    As a result of her high-risk pregnancy and pregnancy-related complications

during her third trimester, including the intrauterine growth restrictions, Ms.

Border's abilities to travel, lift, stand for long periods of time, and carry her baby

to term, were substantially limited, as was the functioning of her reproductive

system.

52.    Because of her medical restrictions, Ms. Border was unable to travel to

Defendant's D.C. office beginning in July 2017.

53.    Ms. Border submitted a request for restricted travel to Mr. Kanne and Defendant's

Human Resources department in July 2017, during the third trimester of her

pregnancy.

54.    In or around the summer of 2017, prior to her son's birth, Ms. Border requested

intermittent leave under the FMLA and DCFMLA to be used following the birth

of her son.

55.     In response, Defendant provided Ms. Border a Notice of Eligibility and Rights &
        Responsibilities under the FMLA and a Certification of Health Care Provider for
        Employee's Serious Health Condition under the FMLA.

56.     Before her son was born, Ms. Border completed and returned to Defendant all
        requisite paperwork related to the FMLA and DCFMLA leave.

57.     On August 21, 2017, Defendant approved Ms. Border's request for intermittent
        leave under the FMLA and DCFMLA through December 28, 2017.

58.     Ms. Border continued to successfully perform her duties until the birth of her son
        on August 28, 2017.

59.     Ms. Border's son was born with lung complications and was treated in the
        Newborn Intensive Care Unit ("NICU") for eight nights following his birth.

60.     Ms. Border's son was delivered by cesarean section, requiring Ms. Border to
        undergo abdominal surgery.

61.     Following her abdominal surgery, Ms. Border's abilities to walk, lift, use her
        abdominal muscles, and exercise were substantially limited.

62.     Following her delivery, Ms. Border was required to stay in the hospital for two
        nights.

63.     After her discharge from the hospital, Ms. Border continued to receive treatment
        from her medical providers related to her delivery.

64.     On August 28, 2017, Ms. Border began to use her pre-approved intermittent,
        protected leave to recover from her cesarean section and care for her newborn
        son, including breastfeeding him.

65.    On September 1, 2017, Ms. Border provided Mr. Kanne with her anticipated

intermittent leave schedule through the end of December 2017, which included

working approximately 20 hours per week and using approximately 20 hours of

protected leave per week.

66.    Mr. Kanne approved the schedule proposed in Ms. Border's September 1, 2017

email.

67.    While on protected leave, Ms. Border submitted all paperwork necessary to keep

Mr. Kanne and her team apprised of her schedule, including bi-weekly

Intermittent Family Medical Leave Records which indicated the amount of leave

that she had taken and the work that she had performed.

68.    Ms. Kanne approved and signed each of Ms. Border's bi-weekly Intermittent

Family Medical Leave Records and submitted them to the Human Resources

department.

69.    Ms. Border's medical providers recommended that Ms. Border limit travel

through December 28, 2017, in order to allow her time to recover from her

cesarean section and to care for her newborn son, including breastfeeding him.

70.    On October 22, 2017, and November 20, 2017, Ms. Border submitted

documentation from her medical providers in support of her request for leave and

travel restrictions.

71.    On or around October 27, 2017, Mr. Kanne visited Naples, Florida and met with

Ms. Border.

72.     During that meeting, Mr. Kanne expressed that he was considering demoting Ms. Border from her Managing Director position and removing her team from her supervision.

73.     Mr. Kanne said he was considering these changes because he was unhappy with Ms. Border's use of approved intermittent leave and because she had not been present in the D.C. office since her medical providers had placed her on travel restrictions.

74.     During that meeting, Mr. Kanne did not suggest that the contemplated demotion was related to Ms. Border's performance, nor did he rescind approval of Ms. Border's intermittent leave.

75.     Ms. Border asked Mr. Kanne to reconsider his position, and he agreed that Ms. Border could continue in her same position.

76.     Between August 28, 2017, and January 2, 2018, Ms. Border took approximately 238.50 hours, or approximately 6 weeks, of protected leave.

77.     On January 2, 2018, Ms. Border returned to work full-time and understood at the time that she would remain in her position as Managing Director of Investor Relations.

78.     On January 8, 2018, during a meeting with Ms. Border, Mr. Kanne demoted Ms. Border and removed Ms. Border from the Management Committee.

79.     During the meeting effecting these changes, Mr. Kanne explicitly stated these actions were due to her use of pre-approved protected leave and her travel restrictions, which had prevented her from traveling to the D.C. office for approximately six months.

80.     Mr. Kanne claimed that using part-time leave was not the most effective way for Ms. Border to structure her leave, despite having approved her proposed intermittent leave schedule.  Mr. Kanne stated that he considered Ms. Border's leave choices to be a bad management decision because she had failed to consider a leave structure that would be most beneficial for Defendant.

81.     During the meeting, Mr. Kanne did not raise any performance concerns as a basis for Ms. Border's demotion.

82.     Mr. Kanne also revoked Defendant's decision to issue Ms. Border a long-term incentive bonus of $140,000 annually for 2016, 2017, and 2018.

83.     Around the same time, Mr. Kanne reduced Ms. Border's 2017 target bonus from 100 percent of her base salary to 90 percent of her base salary, explicitly because of Ms. Border's use of protected leave, despite the fact that she had met all her performance targets for 2017.

84.     At the same time as Ms. Border's demotion, Mr. Kanne promoted Sam Bendix, a less experienced male colleague, to the position of Managing Director, the same position as Ms. Border, a decision finalized on February 1, 2018.

85.     Mr. Bendix's new job description included many of Ms. Border's former responsibilities.

86.     Prior to and continuing after his promotion to Managing Director, Mr. Bendix worked remotely full-time from Chicago, Illinois.

87.     Upon information and belief, Mr. Bendix received a 2017 bonus of 100% of his salary.

88.     During a meeting on or about January 31, 2018, Mr. Kanne reiterated that his
        demotion of Ms. Border was directly based on her use of leave, despite the fact
        that he had approved her intermittent leave schedule.

89.     Ms. Border strongly objected to her demotion, advocating that she retain her
        Managing Director title.  In response, Mr. Kanne changed her title to Managing
        Director of Fund Marketing and Institutional Accounts.

90.     However, even after revising her title, Defendant still removed Ms. Border's team
        from her supervision and removed her from the Management Committee.  Ms.
        Border's new position also had significantly reduced duties.

91.     Defendant did not restore Ms. Border's full 2017 target bonus or her long-term
        incentive bonus.

92.     On February 4, 2018, Mr. Kanne issued a memorandum to the Investor Relations
        team informing them of Ms. Border's change in title and the new supervisory
        structure.

93.     The memorandum explained Ms. Border's new role in the company by stating
        that remote management was not ideal for her team, despite this not having been a
        problem before Ms. Border began using approved, protected leave.

94.     The memorandum did not raise any concerns with Ms. Border's performance.

95.     Instead, the memorandum acknowledged the significant "progress" of the Investor
        Relations department under Ms. Border's supervision.

96.     In her new role, although Ms. Border no longer managed a team and split her
        duties with Mr. Bendix, her duties and responsibilities still included handling
        aspects of institutional fundraising.

97.     The revised position descriptions of Ms. Border and Mr. Bendix made clear that, although Ms. Border and Mr. Bendix were both "Managing Directors," Mr. Bendix's responsibilities were greater and he enjoyed more autonomy in his position.

98.     On April 30, 2018, Ms. Border, through her counsel, submitted a letter to Mr. Kanne detailing his discriminatory and retaliatory conduct, including that he had demoted her and failed to appropriately compensate her in violation of federal and local anti-discrimination laws and federal and local family and medical leave statutes.

99.     From April 30, 2018, until Ms. Border's termination on December 28, 2018, Mr. Kanne's discriminatory and retaliatory actions towards Ms. Border escalated.

100.    Mr. Kanne demonstrated increasingly outwardly hostile behaviors towards Ms. Border after she raised concerns of discrimination on April 30, 2018.

101.    Mr. Kanne regularly excluded Ms. Border from meetings which she previously would have attended, deliberately ignored Ms. Border's contributions in front of clients, frequently refused to respond to her communications, and denied her requests for training or to attend networking events, while approving similar requests by her colleagues.

102.    Mr. Kanne also refused to recognize Ms. Border for bringing important contacts to Defendant or acknowledge any of her contributions.

103.    For example, in May 2018, Defendant met with a potential investor, a large Australian superannuation plan, a prospective client who Ms. Border introduced to Defendant.

104.   Defendant had multiple meetings with the Australian superannuation fund throughout May 2018.

105.   During these meetings, Mr. Kanne often ignored, deliberately excluded, or talked over Ms. Border.

106.   During a May 15, 2018, meeting with the prospective client, Mr. Kanne asked Ms. Border's colleague to lead the meeting, despite the fact that Ms. Border had historically led these types of meetings.

107.   Following the meeting with the Australian superannuation fund, Mr. Kanne advised the investor to contact another NREA employee or himself with any questions, even though Ms. Border had been the investor's point of contact before the meeting and there was no reason for her not to remain the point of contact as that had typically been her role prior to April 30, 2018.

108.   During this period, Mr. Kanne also excluded Ms. Border from important meetings that directly implicated her duties and responsibilities.  For example, on May 18, 2018, Mr. Kanne scheduled a meeting entitled "Investor Relations Process" but failed to invite Ms. Border to the meeting.

109.   Upon information and belief, Mr. Bendix participated in the meeting on May 18, 2018.

110.   Ms. Border was initially scheduled to present at a May 21, 2018, meeting with another investor that she had prospected, a Japanese pension fund.

111.   After Ms. Border complained of discrimination, Mr. Kanne removed Ms. Border's name from the list of presenters identified in the presentation schedule and permitted her only to briefly introduce Mr. Kanne to the investor rather than

contribute substantively during the meeting as she typically would have done previously.

112.    Prior to the meeting with the Japanese pension fund, Ms. Border spearheaded the preparation efforts, including sending many emails to Mr. Kanne in preparation for the meeting.

113.    Mr. Kanne failed to respond to her emails.

114.    The meeting was considered a great success.  Both the prospective client and the consultant provided positive feedback after the meeting in a follow-up email to Ms. Border and Mr. Kanne.

115.    Mr. Kanne later sent an email to over fifteen employees, including the investor relations team, asset management team, and portfolio management team, and thanked each individual involved in the meeting for their contributions except Ms. Border, whom he refused to acknowledge even though she had initiated the introduction, secured and orchestrated the entire meeting, and provided materials for the meeting with the Japanese pension fund.

116.    Separately, Mr. Kanne reprimanded Ms. Border for leaving the meeting to pump breast milk for her infant.

117.    Mr. Kanne had previously made comments about breastfeeding mothers intended to discourage employees from breastfeeding.

118.    Prior to complaining of discrimination, Ms. Border had actively engaged with a prospective client, a large state pension fund, and confirmed an in-person meeting pursuant to Mr. Kanne's request.

119.    After Ms. Border engaged in protected activity, Mr. Kanne asked her not to attend

the meeting with the state pension fund.  Mr. Kanne attended the meeting without

Ms. Border and did not allow Ms. Border to serve as the point of contact for the

state pension fund, even though Ms. Border had previously done so and

historically would have remained the point of contact.

120.    In June and July 2018, at Defendant's request, Ms. Border agreed to go on

administrative leave for the sole purpose of allowing the parties to discuss a

potential resolution of the instant matter.

121.    Defendant instructed Ms. Border not to access, review, or respond to work email

during the time she was on administrative leave.

122.    In mid-July 2018, after attempts at resolution proved unsuccessful, Ms. Border

returned to the workplace.

123.    On or around July 20, 2018, Ms. Border filed her Initial Charge with the EEOC

and cross-filed it with DCOHR.

124.    Shortly after Ms. Border filed her Initial Charge, Mr. Kanne's retaliation against

Ms. Border further escalated.

125.    Following Ms. Border's return to work after being on administrative leave, Mr.

Kanne further limited Ms. Border's duties by assigning her to raise capital for a

single fund, the INDURE BUILD-to-CORE Fund ("INDURE"), rather than

generally overseeing institutional fundraising activities as she had previously

done.

126.   Mr. Kanne removed all of Ms. Border's other duties and excluded her from all other meetings and communications related to the work of the Investor Relations team.

127.   The INDURE fund was known to be "underperforming," as it consistently performed below its custom benchmark and all other industry benchmarks, according to industry experts and Mr. Kanne himself.

128.   In fact, at all times relevant to the Complaint, Defendant's management, Ms. Border's colleagues, and outside consultants all stated that they would not recommend the fund to investors due to INDURE's performance concerns.

129.   When Ms. Border first began working for Defendant, she was instructed to limit her time raising capital for the INDURE fund, until it was no longer underperforming.

130.   In 2017, Defendant explicitly stated that it would not seek to raise capital for the INDURE fund until the fund was no longer underperforming and consistently met benchmarks.

131.   In its written 2018 annual goals submitted by Mr. Kanne to the Board of Directors, Defendant indicated that it did not intend to raise capital for the INDURE fund in 2018.

132.   INDURE has continued to underperform and did not meet benchmarks in 2018.

133.   Most recently, in the fourth quarter of 2018, the INDURE fund produced a negative return.

134.   Despite Defendant's and Mr. Kanne's previous decision not to raise funds for INDURE and the concerns expressed by outside consultants, Mr. Kanne

reassigned Ms. Border to raise funds for INDURE after she complained of discrimination.

135.   In September 2018, Mr. Kanne provided Ms. Border with a negative performance review that provided her with the lowest rating in nearly every performance area.

136.   The September 2018 performance review was in stark contrast with prior feedback from Mr. Kanne and other senior management regarding Ms. Border's performance.

137.   Ms. Border had previously requested that Mr. Kanne complete a performance review of her work in August 2017 and January 2018.  Both times he had declined to do so, did not raise any performance concerns at those times, and awarded bonuses and raises to Ms. Border for those performance periods.  Ms. Border had also previously submitted self-evaluations to which Mr. Kanne never responded.

138.   The September 2018 negative performance review contained only vague comments without specificity.

139.   Ms. Border repeatedly requested that Mr. Kanne provide specific examples of the alleged performance deficiencies on which her negative performance review was based, but Mr. Kanne provided only one example, stating that she had failed to respond to emails while she was on administrative leave in June and July 2018, even though she had been specifically instructed not to respond to emails during that timeframe.  Mr. Kanne did not provide any other specific examples, despite Ms. Border's multiple requests both during, and after, the performance review.

140.   In September 2018, Ms. Border learned she was expecting her third child.

141.    In or around September 2018, Ms. Border informed Defendant, including Mr.
        Kanne, that she was pregnant and expecting her third child, and that she required
        travel restrictions during her first trimester because her pregnancy was considered
        high risk given her history of pregnancy-related complications.

142.    In the fall of 2018, Ms. Border introduced a potential new investor, a Norwegian
        government plan, to Defendant and worked to arrange a meeting between the
        prospective investor and Defendant.

143.    Typically, Ms. Border would have remained the point of contact for the potential
        investor and attended the meeting between the investor and Mr. Kanne as she had
        done for many years before.

144.    The prospective investor had expected that Ms. Border would be present for the
        meeting and had included Ms. Border on emails related to scheduling the meeting.

145.    After a meeting had been scheduled, and despite the expectation that Ms. Border
        would be present, Mr. Kanne removed Ms. Border from email communications
        with the prospective investor and sought to change the date of the meeting.

146.    Mr. Kanne unilaterally re-scheduled the meeting with the prospective investor,
        Mr. Bendix, and himself on November 15, 2018, the date Ms. Border was
        scheduled to attend a mediation at the EEOC with Defendant regarding her Initial
        Charge.

147.    Prior to confirming the meeting with the prospective investor, Mr. Kanne was
        aware that Ms. Border would be unavailable on November 15, 2018.

148.    On November 15, 2018, Ms. Border and Defendant participated in a mediation at
        the EEOC.

149. During the mediation, Defendant notified Ms. Border that she would be terminated the following week.

150. On November 19, 2018, Defendant issued Ms. Border a letter stating that she would be terminated effective December 28, 2018 ("termination letter").

151. The termination letter stated the reason for Ms. Border's termination was that her position was being eliminated so that Defendant could "focus[] on retail capital raising" rather than "institutional investors."

152. Ms. Border was equally as qualified to engage in retail capital raising as similarly-situated male employees who were not terminated.

153. Defendant never previously discussed with Ms. Border its alleged desire to shift focus to retail capital raising, including discussing whether Ms. Border was able to, or interested in, pursuing retail capital raising.

154. After Ms. Border was terminated, Defendant continued to work with institutional investors despite indicating that it would not do so.

155. While working for Defendant, Ms. Border was very successful at developing and cultivating relationships with current and prospective investors, a skill which she could have carried over to retail capital raising.

156. Upon information and belief, Defendant treated other managers who had not taken protected leave, requested an accommodation, or recently given birth to a child, including managers who had complaints lodged against them by employees about their lack of personal and professional skills, more favorably than Ms. Border.

157.   Ms. Border did not receive a 2018 target bonus, which would have amounted to 100 percent of her salary, despite being employed by Defendant for the entire year.

158.   2018 was the only year that Defendant did not award Ms. Border any bonus.

159.   As a result of Defendant's actions, Ms. Border has suffered significant economic harm in the form of lost wages, bonuses and other compensation, as well has emotional harm, including mental anguish, anxiety, stress, humiliation, damage to her professional reputation, and loss of enjoyment of work and life.

**Count I: Interference in Violation of the Family and Medical Leave Act**

160.   Ms. Border re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs in support of her claims under the FMLA.

161.   At all times relevant to this Complaint, Ms. Border was an eligible employee under the FMLA.

162.   At all times relevant to this Complaint, Defendant was a covered employer under the FMLA.

163.   As an eligible employee, Ms. Border was entitled to take twelve weeks of continuous or intermittent protected family and medical leave in a twelve-month period because of her serious health condition and in order to care for her child after his birth.

164.   Ms. Border suffered from a serious health condition when she gave birth by cesarean section, which required an overnight stay at a hospital and continuing treatment by a medical provider.

165.  Ms. Border gave birth to her child on August 28, 2017, and took approximately 238.50 hours (approximately 6 weeks) of pre-approved intermittent FMLA leave between August 28, 2017, and December 28, 2017, in order to care for her child and because of her serious health condition.

166.  Ms. Border gave Defendant adequate notice of her intent to take intermittent leave.

167.  Defendant approved Ms. Border's request to take intermittent leave.

168.  Ms. Border provided all requisite documentation in support of her request for intermittent leave

169.  Defendant was prohibited from interfering with, restraining, and/or denying Ms. Border's exercise of or attempt to exercise her rights under the FMLA.

170.  Defendant willfully interfered with, restrained, and/or denied Ms. Border's exercise of her FMLA rights and/or her attempts to exercise those rights when Mr. Kanne discouraged Ms. Border from using intermittent leave by indicating that it would have negative consequences for her professionally, when Defendant failed to reinstate Ms. Border to an equivalent position and denied her compensation when she returned to a full-time status after using intermittent leave, and when Defendant terminated Ms. Border's employment.

171.  As a result of Defendant's acts, Ms. Border suffered lost wages, bonuses and other compensation, including her 2016, 2017 and 2018 long-term incentive bonus, her full 2017 target bonus, her 2018 target bonus, and lost pay and benefits resulting from her termination.

172.  Defendant's acts and omissions constitute a willful violation of the FMLA.

173.    Defendant's acts and omissions in violation of the FMLA were not in good faith

and Defendant did not have reasonable grounds for believing that its actions did

not violate the FMLA.

174.    Under the FMLA, Ms. Border is entitled to all wages, salary, employment

benefits, or other compensation denied or lost to her by reason of the violation,

interest on this amount calculated at the prevailing rate, and an additional amount

as liquidated damages equal to the sum of the amount of compensation owed to

Ms. Border, as well as attorney's fees and costs.

**Count II: Retaliation in Violation of the Family and Medical Leave Act**

175.    Ms. Border re-alleges and incorporates by reference each and every allegation set

forth in the preceding paragraphs in support of her claims under the FMLA.

176.    At all times relevant to this Complaint, Ms. Border was an eligible employee

under the FMLA.

177.    At all times relevant to this Complaint, Defendant was a covered employer under

the FMLA.

178.    As an eligible employee, Ms. Border was entitled to take twelve weeks of

continuous or intermittent protected family and medical leave in a twelve-month

period because of her serious health condition and in order to care for her child

after his birth.

179.    Ms. Border suffered from a serious health condition when she gave birth by

cesarean section, which required an overnight stay at a hospital and continuing

treatment by a medical provider.

180.    Ms. Border gave birth to her child on August 28, 2017, and took approximately
        238.50 hours (approximately 6 weeks) of pre-approved intermittent FMLA leave
        between August 28, 2017, and December 28, 2017, in order to care for her child
        and because of her serious health condition.

181.    Ms. Border gave Defendant adequate notice of her intent to take intermittent
        leave.

182.    Defendant approved Ms. Border's request to take intermittent leave.

183.    Ms. Border provided all requisite documentation in support of her requests for
        intermittent leave.

184.    Ms. Border engaged in protected activity when she exercised her right to use
        FMLA leave and opposed Defendant's violations of the FMLA, including when
        she complained of Defendant's FMLA violations on April 30, 2018, and when she
        filed a complaint with DCOHR on or around July 20, 2018.

185.    Defendant was prohibited from discriminating or retaliating against Ms. Border
        for engaging in protected activity.

186.    Defendant discriminated and retaliated against Ms. Border when it demoted her
        just days after she returned to work full-time, denied her the long-term incentive
        bonus Defendant had promised her, failed to award her full target bonus for 2017,
        stripped her of all meaningful duties, issued her a poor performance evaluation,
        failed to award her any 2018 bonus, and ultimately terminated her, because Ms.
        Border exercised her right to use FMLA leave and opposed Defendant's
        violations of the FMLA.

187.    As a result of Defendant's acts, Ms. Border suffered lost wages, bonuses and
other compensation, including her 2016, 2017 and 2018 long-term incentive
bonus, her full 2017 target bonus, her 2018 target bonus, and lost pay and benefits
resulting from her termination.

188.    Defendant's actions constitute a willful violation of the FMLA.

189.    Defendant's acts and omissions in violation of the FMLA were not in good faith
and Defendant did not have reasonable grounds for believing that its actions did
not violate the FMLA.

190.    Under the FMLA, Ms. Border is entitled to all wages, salary, employment
benefits, or other compensation denied or lost to her by reason of the violation,
interest on this amount calculated at the prevailing rate, and an additional amount
as liquidated damages equal to the sum of the amount of compensation owed to
Ms. Border, as well as attorney's fees and costs.

**Count III: Interference in Violation of the D.C. Family and Medical Leave Act**

191.    Ms. Border re-alleges and incorporates by reference each and every allegation set
forth in the preceding paragraphs in support of her claims under the DCFMLA.

192.    At all times relevant to this Complaint, Ms. Border was eligible for family and
medical leave under the DCFMLA.

193.    At all times relevant to this Complaint, Defendant was an employer of Ms. Border
under the DCFMLA.

194.    As an eligible employee, Ms. Border was entitled to take sixteen weeks of
continuous or intermittent protected family and medical leave in a twenty-four-
month period because of her serious health condition and the birth of her child.

195.   Ms. Border suffered from a serious health condition when she gave birth by cesarean section, which required an overnight stay at a hospital and continuing treatment by a medical provider.

196.   Ms. Border gave birth to her son on August 28, 2017, and took approximately 238.50 hours (approximately 6 weeks) of pre-approved intermittent DCFMLA leave between August 28, 2017, and December 28, 2017, in order to care for her child and because of her serious health condition.

197.   Ms. Border gave Defendant adequate notice of her intent to take intermittent leave.

198.   Defendant approved Ms. Border's request to take intermittent leave.

199.   Ms. Border provided all requisite documentation in support of her request for intermittent leave

200.   Defendant was prohibited from interfering with, restraining, and/or denying Ms. Border's exercise of or attempt to exercise her rights under the DCFMLA.

201.   Defendant willfully interfered with, restrained, and/or denied Ms. Border's exercise of her DCFMLA rights and/or her attempts to exercise those rights when Mr. Kanne discouraged Ms. Border from using intermittent leave by indicating that it would have negative consequences for her professionally, when Defendant failed to reinstate Ms. Border to an equivalent position and denied her compensation when she returned to a full-time status after using intermittent leave, and when Defendant terminated Ms. Border's employment.

202.   As a result of Defendant's acts, Ms. Border suffered lost wages, bonuses and other compensation, including her 2016, 2017 and 2018 long-term incentive

bonus, her full 2017 target bonus, her 2018 target bonus, and lost pay and benefits resulting from her termination.

203.    Defendant's violation of the DCFMLA did not occur in good faith and Defendant did not have reasonable grounds to believe that its acts and omissions were not in violation of the DCFMLA.

204.    Under the DCFMLA, Ms. Border is entitled to all wages, salary, employment benefits, or other compensation denied or lost to her due to the DCFMLA violation, interest on the amount calculated at the prescribed rate, consequential damages not to exceed an amount equal to three times the amount of lost compensation and interest, medical expenses not covered by the employee's health insurance, and attorney's fees and costs.

**Count IV: Retaliation in Violation of the D.C. Family and Medical Leave Act**

205.    Ms. Border re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs in support of her claims under the DCFMLA.

206.    At all times relevant to her Complaint, Ms. Border was eligible for family and medical leave under the DCFMLA.

207.    At all times relevant to this Complaint, Defendant was an employer of Ms. Border under the DCFMLA.

208.    As an eligible employee, Ms. Border was entitled to take sixteen weeks of continuous or intermittent protected family and medical leave in a twenty-four-month period because of her serious health condition and in order to care for her child after his birth.

209.   Ms. Border suffered from a serious health condition when she gave birth by cesarean section, which required an overnight stay at a hospital and continuing treatment by a medical provider.

210.   Ms. Border gave birth to her child on August 28, 2017, and took approximately 238.50 hours (approximately 6 weeks) of pre-approved intermittent DCFMLA leave between August 28, 2017, and December 28, 2017, in order to care for her child and because of her serious medical condition.

211.   Ms. Border gave Defendant adequate notice of her intent to take intermittent leave.

212.   Defendant approved Ms. Border's request to take intermittent leave.

213.   Ms. Border provided all requisite documentation in support of her request for intermittent leave

214.   Ms. Border engaged in protected activity when she exercised her right to use FMLA leave and opposed Defendant's violations of the DCFMLA, including when she complained of Defendant's violations of the DCFMLA on April 30, 2018, and when she filed a charge of discrimination with DCOHR on or around July 20, 2018.

215.   Defendant was prohibited from discriminating or retaliating against Ms. Border for engaging in protected activity.

216.   Defendant discriminated and retaliated against Ms. Border when it demoted her just days after she returned to work full-time, denied her the long-term incentive bonus Defendant had promised her, failed to award her full target bonus for 2017, stripped her of all meaningful duties, issued her a poor performance evaluation,

failed to award her any 2018 bonus, and ultimately terminated her, because Ms. Border exercised her right to use DCFMLA leave, expressed opposition to Defendant's violations of the DCFMLA, and filed a charge of discrimination with DCOHR.

217.    As a result of Defendant's acts, Ms. Border suffered lost wages, bonuses and other compensation, including her 2016, 2017 and 2018 long-term incentive bonus, her full 2017 target bonus, her 2018 target bonus, and lost pay and benefits resulting from her termination.

218.    Defendant's violation of the DCFMLA did not occur in good faith and Defendant did not have reasonable grounds to believe that its acts and omissions were not in violation of the DCFMLA.

219.    Under the DCFMLA, Ms. Border is entitled to all wages, salary, employment benefits, or other compensation denied or lost to her due to the DCFMLA violation, interest on the amount calculated at the prescribed rate, consequential damages not to exceed an amount equal to three times the amount of lost compensation and interest, medical expenses not covered by the employee's health insurance, and attorney's fees and costs.

**Count V: Discrimination Based on Pregnancy, Childbirth, Breastfeeding, or Related Medical Condition, in Violation of the Protecting Pregnant Workers Fairness Act**

220.    Ms. Border re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs in support of her claims under the PPWFA.

221.    At all times relevant to this Complaint, Ms. Border was an employee of Defendant under the PPWFA.

222.    At all times relevant to this Complaint, Defendant was Ms. Border's employer
        under the PPWFA.

223.    Between July 2017 and January 2, 2018, Ms. Border's ability to perform the
        functions of her position was affected by her pregnancy, childbirth, breastfeeding,
        and related medical conditions.

224.    Ms. Border initially requested travel limitations as reasonable accommodations
        due to pre-birth complications, and later requested intermittent leave and travel
        limitations to recover from childbirth and to care for her newborn infant,
        including breastfeeding him.

225.    Ms. Border provided all requisite documentation in support of her requests for
        travel limitations and intermittent leave.

226.    Defendant subjected Ms. Border to an adverse employment action in violation of
        the PPWFA when it demoted her just days after she returned to work full-time,
        denied her the long-term incentive bonus Defendant had promised her, failed to
        award her full target bonus for 2017, stripped her of all meaningful duties, issued
        her a poor performance evaluation, failed to award her any 2018 bonus, and
        ultimately terminated her because she requested or used a reasonable
        accommodation related to pregnancy, childbirth, breastfeeding, and a related
        medical condition.

227.    As a result of Defendant's acts, Ms. Border suffered economic harm in the form
        of lost wages, bonuses, and other compensation, and attorney's fees and costs.

**Count VI: Discrimination Based on Sex, Pregnancy, Childbirth, or a Related Medical
Condition, in Violation of the Pregnancy Discrimination Act of Title VII**

228. Ms. Border re-alleges and incorporates by reference each and every allegation set

forth in the preceding paragraphs in support of her claims under the PDA.

229. At all times relevant to this Complaint, Ms. Border was an employee of

Defendant under PDA.

230. At all times relevant to this Complaint, Ms. Border was a woman affected by

pregnancy, childbirth, or related medical conditions, a class protected by the

provisions of the PDA.

231. At all times relevant to this Complaint, Defendant was Ms. Border's employer

under the PDA.

232. In July 2017, Ms. Border requested travel restrictions due to her pregnancy and

pregnancy-related medical conditions.

233. Defendant was aware that Ms. Border was pregnant and that her request for travel

limitations in July 2017 was based on her pregnancy and pregnancy-related

medical conditions.

234. Prior to the birth of her child, Ms. Border requested leave to be used following the

birth of her child in order to recover from childbirth and to care for her newborn

infant, including breastfeeding him.

235. Ms. Border also requested travel restrictions following the birth of her son in

order to recover from her cesarean section and care for her newborn infant,

including breastfeeding him.

236. Defendant was aware that Ms. Border had given birth and that her request for leave and continued travel restrictions following the birth of her child in August 2017 was based on childbirth or a related medical condition.

237. In September 2018, Ms. Border informed Defendant that she was pregnant with her third child and would again require pregnancy-related travel restrictions.

238. Ms. Border provided medical documentation in support of her request for pregnancy-related travel limitations and her request for leave following childbirth.

239. Defendant treated Ms. Border less favorably than other employees not affected by pregnancy, childbirth, or related medical conditions.

240. Defendant subjected Ms. Border to an adverse employment action when Defendant demoted Ms. Border, denied her the long-term incentive bonus she had been promised, failed to award her full target bonus for 2017, failed to award her any 2018 target bonus, and ultimately terminated her employment based on her pregnancy, childbirth, and related medical conditions, in violation of the PDA.

241. As a result of Defendant's acts, Ms. Border suffered economic harm in the form of lost wages and compensation, as well as emotional harm, including mental anguish, anxiety, stress, humiliation, damage to her professional reputation, and loss of enjoyment of work and life.

242. Defendant's actions were wanton, reckless, or in willful disregard of Ms. Border's legal rights and were motivated by evil intent.

### Count VII: Discrimination Based on Sex, Pregnancy, Childbirth, or a Related Medical Condition, in Violation of the D.C. Human Rights Act

243. Ms. Border re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs in support of her claims under the DCHRA.

244.  At all times relevant to this Complaint, Ms. Border was an employee of Defendant under the DCHRA.

245.  At all times relevant to this Complaint, Defendant was Ms. Border's employer under the DCHRA.

246.  At all times relevant to this Complaint, Ms. Border was a woman affected by pregnancy, childbirth, or related medical conditions, a class protected by the provisions of the DCHRA.

247.  In July 2017, Ms. Border requested travel restrictions due to her pregnancy and pregnancy-related medical condition.

248.  Defendant was aware that Ms. Border was pregnant and that her request for travel limitations in July 2017 was based on her pregnancy and pregnancy-related medical conditions.

249.  Prior to the birth of her child, Ms. Border requested leave to be used following the birth of her child in order to recover from childbirth and to care for her newborn infant, including breastfeeding him.

250.  Defendant was aware that Ms. Border had given birth and that her request for leave and continued travel restrictions following the birth of her child in August 2017 was based on childbirth or a related medical condition.

251.  In September 2018, Ms. Border informed Defendant that she was pregnant with her third child and would again require pregnancy-related travel restrictions.

252.  Ms. Border provided medical documentation in support of her request for pregnancy-related travel limitations and her request for leave following childbirth.

253.    Defendant treated Ms. Border less favorably than other employees not affected by
        pregnancy, childbirth, or related medical conditions.

254.    Defendant subjected Ms. Border to an adverse employment action when
        Defendant demoted Ms. Border, denied her the long-term incentive bonus she had
        been promised, failed to award her full target bonus for 2017, failed to award her
        any 2018 target bonus, and ultimately terminated her employment based on her
        pregnancy, childbirth, and related medical conditions, in violation of the DCHRA.

255.    As a result of Defendant's acts, Ms. Border suffered economic harm in the form
        of lost wages and compensation, as well as emotional harm, including mental
        anguish, anxiety, stress, humiliation, damage to her professional reputation, and
        loss of enjoyment of work and life.

256.    Defendant's actions were wanton, reckless, or in willful disregard of Ms. Border's
        legal rights and were motivated by evil intent.

### Count VIII: Discrimination Based on Family Responsibilities in Violation of the D.C. Human Rights Act

257.    Ms. Border re-alleges and incorporates by reference each and every allegation set
        forth in the preceding paragraphs in support of her claims under the DCHRA.

258.    At all times relevant to this Complaint, Ms. Border was an employee of
        Defendant under the DCHRA.

259.    At all times relevant to this Complaint, Defendant was Ms. Border's employer
        under the DCHRA.

260.    At all times relevant to this Complaint, Ms. Border was supporting a person in a
        dependent relationship, her newborn child.

261.    Defendant was aware that Ms. Border was supporting a person in a dependent

relationship.

262.    Prior to the birth of her child, Ms. Border requested leave to be used following the

birth of her child in order to care for her newborn infant.

263.    Defendant was aware that Ms. Border had requested and taken leave based on her

family responsibilities.

264.    Defendant subjected Ms. Border to an adverse employment action when

Defendant demoted Ms. Border, denied her the long-term incentive bonus she had

been promised, failed to award her  full target bonus for 2017, failed to award her

any 2018 target bonus, and ultimately terminated her employment based on her

family responsibilities, in violation of the DCHRA.

265.    As a result of Defendant's acts, Ms. Border suffered economic harm in the form

of lost wages and compensation, as well as emotional harm, including mental

anguish, anxiety, stress, humiliation, damage to her professional reputation, and

loss of enjoyment of work and life.

266.    Defendant's actions were wanton, reckless, or in willful disregard of Ms. Border's

legal rights and were motivated by evil intent.

**Count IX: Retaliation in Violation of Title VII of the Civil Rights Act**

267.    Ms. Border re-alleges and incorporates by reference each and every allegation set

forth in the preceding paragraphs in support of her claims under Title VII.

268.    At all times relevant to this Complaint, Ms. Border was an employee of

Defendant under Title VII.

269.  At all times relevant to this Complaint, Defendant was Ms. Border's employer under Title VII.

270.  Ms. Border engaged in protected activity when she opposed unlawful practices under Title VII, including when she complained of Defendant's violations of Title VII on April 30, 2018, when she filed her charge of discrimination with the EEOC in July 2018, and when she subsequently pursued her charge before the EEOC, including by participating in a mediation at the EEOC.

271.  Defendant was prohibited from retaliating against Ms. Border for engaging in protected activity.

272.  After Ms. Border first complained of violations of Title VII, Defendant retaliated against Ms. Border when it excluded her from external and internal meetings, ignored her and failed to respond to her communications, reprimanded her, disparaged her privately and in front of colleagues and clients, and prohibited her from client contact in retaliation for her protected activity.

273.  After Ms. Border filed her charge of discrimination with the EEOC, and while she was pursuing that charge, Defendant further retaliated against Ms. Border by continuing to reduce her duties, stripping her of all meaningful duties, assigning her to raise capital for a single, underperforming account, issuing her a poor performance evaluation, failing to award her any 2018 target bonus, and ultimately terminating her employment.

274.   Defendant singled out Ms. Border and treated her differently than similarly-situated individuals who did not engage in protected activity.

275.    As a result of Defendant's acts, Ms. Border suffered economic harm in the form

of lost wages, bonuses and other compensation, as well as emotional harm,

including mental anguish, anxiety, stress, humiliation, damage to her professional

reputation, and loss of enjoyment of work and life.

276.    Defendant's actions were wanton, reckless, or in willful disregard of Ms. Border's

legal rights and were motivated by evil intent.

**Count X: Retaliation in Violation of the D.C. Human Rights Act**

277.    Ms. Border re-alleges and incorporates by reference each and every allegation set

forth in the preceding paragraphs in support of her claims under the DCHRA.

278.    At all times relevant to this Complaint, Ms. Border was an employee of

Defendant under the DCHRA.

279.    At all times relevant to this Complaint, Defendant was Ms. Border's employer

under the DCHRA.

280.    At all times relevant to this Complaint, Ms. Border was a woman affected by

pregnancy, childbirth, or related medical conditions, a class protected by the

provisions of the DCHRA.

281.    Ms. Border was a qualified individual with a disability under the DCHRA.

282.    Ms. Border suffered from a physical impairment related to pregnancy, including

that she had a high-risk pregnancy and that her baby experienced intrauterine

growth restrictions during her third trimester, which substantially limited one or

more major life activities, including the ability to travel, lift, stand for long

periods of time, carry her baby to term, give birth, and the functioning of her

reproductive system.

283.   Ms. Border delivered her son via cesarean section, which substantially limited one or more major life activities including the ability to walk, lift, use her abdominal muscles, and exercise.

284.   Ms. Border was able to perform the essential functions of her position, with the accommodation of avoiding travel for a limited period of time and using intermittent leave.

285.   Ms. Border engaged in protected activity when she requested intermittent leave and travel limitations as reasonable accommodations based on her disability and subsequently availed herself of these approved reasonable accommodations.

286.   Ms. Border also engaged in protected activity when she opposed unlawful practices under the DCHRA, including when she complained of Defendant's violations of the DCHRA on April 30, 2018, when she filed a charge of discrimination with DCOHR on or around July 20, 2018, and when she subsequently pursued that charge.

287.   Defendant violated the DCHRA when it demoted Ms. Border, denied her the long-term incentive bonus she had been promised, and failed to award her =full target bonus in 2017 because she requested a reasonable accommodation and availed herself of approved reasonable accommodations.

288.   After Ms. Border first complained of violations of the DCHRA, Defendant retaliated against Ms. Border when it excluded her from external and internal meetings, ignored her and failed to respond to her communications, reprimanded her, disparaged her privately and in front of colleagues and clients, and prohibited her from client contact in retaliation for her protected activity.

289.    After Ms. Border filed her charge of discrimination with the EEOC and cross-
        filed it with DCOHR, and while she was pursuing that charge, Defendant further
        retaliated against Ms. Border by continuing to reduce her duties, stripping her of
        all meaningful duties, assigning her to raise capital for a single, underperforming
        account, issuing her a poor performance evaluation, failing to award her any 2018
        target bonus, and ultimately terminating her employment.

290.     Defendant singled out Ms. Border and treated her differently than similarly-
        situated individuals who did not engage in protected activity.

291.    As a result of Defendant's acts, Ms. Border suffered economic harm in the form
        of lost wages, bonuses and other compensation, as well as emotional harm,
        including mental anguish, anxiety, stress, humiliation, damage to her professional
        reputation, and loss of enjoyment of work and life.

292.    Defendant's actions were wanton, reckless, or in willful disregard of Ms. Border's
        legal rights and were motivated by evil intent.

**Count XI: Retaliation in Violation of the Americans with Disabilities Act**

293.    Ms. Border re-alleges and incorporates by reference each and every allegation set
        forth in the preceding paragraphs in support of her claims under the ADA.

294.    At all times relevant to this Complaint, Ms. Border was Defendant's employee
        under the ADA.

295.    At all times relevant to this Complaint, Defendant was Ms. Border's employer
        under the ADA.

296.    Ms. Border was a qualified individual with a disability under the ADA.

297.   Ms. Border suffered from a physical impairment related to pregnancy, including that she had a high-risk pregnancy and that her baby experienced intrauterine growth restrictions during her third trimester, which substantially limited one or more major life activities, including the ability to travel, lift, stand for long periods of time, carry her baby to term, give birth, and the functioning of her reproductive system.

298.   Ms. Border delivered her son via cesarean section, which substantially limited one or more major life activities, including the ability to walk, lift, user her abdominal muscles, and exercise.

299.   Ms. Border was able to perform the essential functions of her position, with the accommodation of avoiding travel for a limited period of time and using intermittent leave.

300.   Ms. Border engaged in protected activity when she requested intermittent leave and travel limitations as reasonable accommodations based on her disability and subsequently availed herself of these approved reasonable accommodations.

301.   Ms. Border further engaged in protected activity when she opposed unlawful practices under the ADA, including when she complained of Defendant's violations of the ADA on April 30, 2018, when she filed a charge of discrimination with the EEOC on or around July 20, 2018, and when she subsequently pursued that charge, including participating in a mediation at the EEOC.

302.   Defendant violated the ADA when it demoted Ms. Border, denied her the long-term incentive bonus she had been promised, and failed to award her full target

bonus in 2017 in retaliation of her request and subsequent use of approved reasonable accommodations.

303.    After Ms. Border first complained of violations of the ADA, Defendant retaliated against Ms. Border when it excluded her from external and internal meetings, ignored her and failed to respond to her communications, reprimanded her, disparaged her privately and in front of colleagues and clients, and prohibited her from client contact in retaliation for her protected activity.

304.    After Ms. Border filed her charge of discrimination with the EEOC, and while she was pursuing that charge, Defendant further retaliated against Ms. Border by continuing to reduce her duties, stripping her of all meaningful duties, assigning her to raise capital for a single, underperforming account, issuing her a poor performance evaluation, failing to award her any 2018 bonus, and ultimately terminating her employment.

305.    Defendant singled out Ms. Border and treated her differently than similarly-situated individuals who did not engage in protected activity.

306.    As a result of Defendant's acts, Ms. Border suffered economic harm in the form of lost wages, bonuses and other compensation, as well as emotional harm, including mental anguish, anxiety, stress, humiliation, damage to her professional reputation, and loss of enjoyment of work and life.

307.    Defendant's actions were wanton, reckless, or in willful disregard of Ms. Border's legal rights and were motivated by evil intent.

**Count XII: Harassment Based on Sex, Pregnancy, Childbirth, or a Related Medical Condition, in Violation of the Pregnancy Discrimination Act of Title VII**

308.    Ms. Border re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs in support of her claims under Title VII.

309.    At all times relevant to this Complaint, Ms. Border was an employee of Defendant under Title VII.

310.    At all times relevant to this Complaint, Ms. Border was a woman affected by pregnancy, childbirth, or related medical conditions, a class protected by the provisions of Title VII.

311.    At all times relevant to this Complaint, Defendant was Ms. Border's employer under Title VII.

312.    Defendant subjected Ms. Border to a hostile work environment based on her pregnancy, childbirth, and related medical conditions when it took adverse actions against her, including demoting her, denying her the long-term incentive bonus she had been promised, failing to award her full target bonus for 2017, failing to award her any 2018 target bonus, and terminating her employment, and when Mr. Kanne ignored Ms. Border and failed to respond to her communications, reprimanded her, disparaged her privately and in front of colleagues and co-workers, excluded her from internal and external meetings, prohibited her from client contact, stripped her of all meaningful duties, and issued her a poor performance evaluation.

313.    Defendant's conduct was unwelcome.

314.    Defendant was aware that its conduct was unwelcome.

43

315.    Defendant's actions were sufficiently severe or pervasive so as to create an intimidating, hostile, and offensive work environment.

316.    The harassment culminated in Ms. Border's termination.

317.    As a result of Defendant's acts, Ms. Border suffered economic harm in the form of lost wages, bonuses and other compensation, as well as emotional harm, including mental anguish, anxiety, stress, humiliation, damage to her professional reputation, and loss of enjoyment of work and life.

318.    Defendant's actions were wanton, reckless, or in willful disregard of Ms. Border's legal rights and were motivated by evil intent.

### Count XIII: Harassment Based on Sex, Pregnancy, Childbirth, or a Related Medical Condition in Violation of the D.C. Human Rights Act

319.    Ms. Border re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs in support of her claims under the DCHRA.

320.    At all times relevant to this Complaint, Ms. Border was an employee of Defendant under the DCHRA.

321.    At all times relevant to this Complaint, Defendant was Ms. Border's employer under the DCHRA.

322.    At all times relevant to this Complaint, Ms. Border was a woman affected by pregnancy, childbirth, or related medical conditions, a class protected by the provisions of the DCHRA.

323.    Defendant subjected Ms. Border to a hostile work environment based on her pregnancy, childbirth, and related medical conditions when it took adverse actions against her, including demoting her, denying her the long-term incentive bonus she had been promised, failing to award her full target bonus for 2017, failing to

award her any 2018 target bonus, and terminating her employment, and when Mr.
Kanne ignored Ms. Border and failed to respond to her communications,
reprimanded her, disparaged her privately and in front of colleagues and co-
workers, excluded her from internal and external meetings, prohibited her from
client contact, stripped her of all meaningful duties, and issued her a poor
performance evaluation.

324.    Defendant's conduct was unwelcome.

325.    Defendant was aware that its conduct was unwelcome.

326.    Defendant's actions were sufficiently severe or pervasive so has to create an
intimidating, hostile, and offensive work environment.

327.    The harassment culminated in Ms. Border's termination.

328.    As a result of Defendant's acts, Ms. Border suffered economic harm in the form
of lost wages, bonuses and other compensation, as well as emotional harm,
including mental anguish, anxiety, stress, humiliation, damage to her professional
reputation, and loss of enjoyment of work and life.

329.    Defendant's actions were wanton, reckless, or in willful disregard of Ms. Border's
legal rights and were motivated by evil intent.

**Count XIV: Harassment Based on Disability in Violation of the Americans with
Disabilities Act**

330.    Ms. Border re-alleges and incorporates by reference each and every allegation set
forth in the preceding paragraphs in support of her claims under the ADA.

331.    At all times relevant to this Complaint, Ms. Border was Defendant's employee
under the ADA.

332. At all times relevant to this Complaint, Defendant was Ms. Border's employer under the ADA.

333. At all times relevant to this Complaint, Ms. Border was a qualified individual with a disability under the ADA.

334. Ms. Border suffered from a physical impairment related to pregnancy, including that she had a high-risk pregnancy and her baby experienced intrauterine growth restrictions during her third trimester, which substantially limited one or more major life activities including the ability to travel, lift, stand for long periods of time, carry her baby to term, give birth, and the functioning of her reproductive system.

335. Ms. Border delivered her son via cesarean section, which substantially limited one or more major life activity including the ability to walk, lift, user her abdominal muscles, and exercise.

336. Defendant subjected Ms. Border to a hostile work environment based on her pregnancy, childbirth, and related medical conditions when it took adverse actions against her, including demoting her, denying her the long-term incentive bonus she had been promised, failing to award her her full target bonus for 2017, failing to award her any 2018 target bonus, and terminating her employment, and when Mr. Kanne ignored Ms. Border and failed to respond to her communications, reprimanded her, disparaged her privately and in front of colleagues and co-workers, excluded her from internal and external meetings, prohibited her from client contact, stripped her of all meaningful duties, and issued her a poor performance evaluation.

337. Defendant's conduct was unwelcome.

338. Defendant was aware that its conduct was unwelcome.

339. Defendant's actions were sufficiently severe or pervasive so has to create an intimidating, hostile, and offensive work environment.

340. The harassment culminated in Ms. Border's termination.

341. As a result of Defendant's acts, Ms. Border suffered economic harm in the form of lost wages, bonuses and other compensation, as well as emotional harm, including mental anguish, anxiety, stress, humiliation, damage to her professional reputation, and loss of enjoyment of work and life.

342. Defendant's actions were wanton, reckless, or in willful disregard of Ms. Border's legal rights and were motivated by evil intent.

### Count XV: Harassment based on Protected Activity in Violation of the Pregnancy Discrimination Act of Title VII

343. Ms. Border re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs in support of her claims under Title VII.

344. At all times relevant to this Complaint, Ms. Border was an employee of Defendant under Title VII.

345. At all times relevant to this Complaint, Defendant was Ms. Border's employer under Title VII.

346. Ms. Border engaged in protected activity when she opposed unlawful practices under Title VII, including when she complained of Defendant's violations of Title VII on April 30, 2018, when she filed her charge of discrimination with the EEOC in July 2018, and when she subsequently pursued her charge before the EEOC, including by participating in a mediation at the EEOC.

347.   Defendant was prohibited from harassing Ms. Border for engaging in protected activity.

348.   Defendant subjected Ms. Border to a hostile work environment based on her protected activity when it took adverse actions against her, including failing to award her any 2018 target bonus and terminating her employment, and when Mr. Kanne ignored Ms. Border and failed to respond to her communications, reprimanded her, disparaged her privately and in front of colleagues and co-workers, excluded her from internal and external meetings, prohibited her from client contact, stripped her of all meaningful duties, and issued her a poor performance evaluation.

349.   Defendant's conduct was unwelcome.

350.   Defendant was aware that its conduct was unwelcome.

351.   Defendant's actions were sufficiently severe or pervasive so as to create an intimidating, hostile, and offensive work environment.

352.   The harassment culminated in Ms. Border's termination.

353.   As a result of Defendant's acts, Ms. Border suffered economic harm in the form of lost wages, bonuses and other compensation, as well as emotional harm, including mental anguish, anxiety, stress, humiliation, damage to her professional reputation, and loss of enjoyment of work and life.

354.   Defendant's actions were wanton, reckless, or in willful disregard of Ms. Border's legal rights and were motivated by evil intent.

## Count XVI: Harassment Based on Protected Activity in Violation of the D.C. Human Rights Act

355.　Ms. Border re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs in support of her claims under the DCHRA.

356.　At all times relevant to this Complaint, Ms. Border was an employee of Defendant under the DCHRA.

357.　At all times relevant to this Complaint, Defendant was Ms. Border's employer under the DCHRA.

358.　At all times relevant to this Complaint, Ms. Border was a woman affected by pregnancy, childbirth, or related medical conditions, a class protected by the provisions of the DCHRA.

359.　At all times relevant to this Complaint, Ms. Border was a qualified individual with a disability under the DCHRA.

360.　Ms. Border suffered from a physical impairment related to pregnancy, including that she had a high-risk pregnancy and that her baby experienced intrauterine growth restrictions during her third trimester, which substantially limited one or more major life activities, including the ability to travel, lift, stand for long periods of time, carry her baby to term, give birth, and the functioning of her reproductive system.

361.　Ms. Border delivered her son via cesarean section, which substantially limited one or more major life activities including the ability to walk, lift, user her abdominal muscles, and exercise.

362.    Ms. Border was able to perform the essential functions of her position, with the accommodation of avoiding travel for a limited period of time and using intermittent leave.

363.    Ms. Border engaged in protected activity when she requested intermittent leave and travel limitations as reasonable accommodations based on her disability and subsequently availed herself of these approved reasonable accommodations.

364.    Ms. Border also engaged in protected activity when she opposed unlawful practices under the DCHRA, including when she complained of Defendant's violations of the DCHRA on April 30, 2018, when she filed a charge of discrimination with DCOHR on or around July 20, 2018, and when she subsequently pursued that charge.

365.    Defendant subjected Ms. Border to a hostile work environment based on her protected activity when it took adverse actions against her, including demoting her, denying her the long-term incentive bonus she had been promised, failing to award her full target bonus for 2017, failing to award her any 2018 target bonus, and terminating her employment, and when Mr. Kanne ignored Ms. Border and failed to respond to her communications, reprimanded her, disparaged her privately and in front of colleagues and co-workers, excluded her from internal and external meetings, prohibited her from client contact, stripped her of all meaningful duties, and issued her a poor performance evaluation.

366.    Defendant's conduct was unwelcome.

367.    Defendant was aware that its conduct was unwelcome.

368.    Defendant's actions were sufficiently severe or pervasive so has to create an intimidating, hostile, and offensive work environment.

369.    The harassment culminated in Ms. Border's termination.

370.    As a result of Defendant's acts, Ms. Border suffered economic harm in the form of lost wages, bonuses and other compensation, as well as emotional harm, including mental anguish, anxiety, stress, humiliation, damage to her professional reputation, and loss of enjoyment of work and life.

371.    Defendant's actions were wanton, reckless, or in willful disregard of Ms. Border's legal rights and were motivated by evil intent.

**Count XVII: Harassment Based on Protected Activity in Violation of the Americans with Disabilities Act**

372.    Ms. Border re-alleges and incorporates by reference each and every allegation set forth in the preceding paragraphs in support of her claims under the ADA.

373.    At all times relevant to this Complaint, Ms. Border was Defendant's employee under the ADA.

374.    At all times relevant to this Complaint, Defendant was Ms. Border's employer under the ADA.

375.    At all times relevant to this Complaint, Ms. Border was a qualified individual with a disability under the ADA.

376.    Ms. Border suffered from a physical impairment related to pregnancy, including that she had a high-risk pregnancy and her baby experienced intrauterine growth restrictions during her third trimester, which substantially limited one or more major life activities including the ability to travel, lift, stand for long periods of

time, carry her baby to term, give birth, and the functioning of her reproductive system.

377. Ms. Border delivered her son via cesarean section, which substantially limited one or more major life activity including the ability to walk, lift, user her abdominal muscles, and exercise.

378. Ms. Border engaged in protected activity when she requested intermittent leave and travel limitations as reasonable accommodations based on her disability and subsequently availed herself of these approved reasonable accommodations.

379. Ms. Border also engaged in protected activity when she opposed unlawful practices under the ADA, including when she complained of Defendant's violations of the ADA on April 30, 2018, when she filed a charge of discrimination with the EEOC on or around July 20, 2018, and when she subsequently pursued that charge, including by participating in a mediation at the EEOC.

380. Defendant's actions created a hostile work environment for Ms. Border based on her pregnancy, childbirth, and related medical conditions when it took adverse actions against her, including demoting her, denying her the long-term incentive bonus she had been promised, failing to award her full target bonus for 2017, failing to award her any 2018 target bonus, and terminating her employment, and when Mr. Kanne ignored Ms. Border and failed to respond to her communications, reprimanded her, disparaged her privately and in front of colleagues and co-workers, excluded her from internal and external meetings,

prohibited her from client contact, stripped her of all meaningful duties, and issued her a poor performance evaluation.

381.   Defendant's conduct was unwelcome.

382.   Defendant was aware that its conduct was unwelcome.

383.   Defendant's actions were sufficiently severe or pervasive so has to create an intimidating, hostile, and offensive work environment.

384.   The harassment culminated in Ms. Border's termination.

385.   As a result of Defendant's acts, Ms. Border suffered economic harm in the form of lost wages, bonuses and other compensation, as well as emotional harm, including mental anguish, anxiety, stress, humiliation, damage to her professional reputation, and loss of enjoyment of work and life.

386.   Defendant's actions were wanton, reckless, or in willful disregard of Ms. Border's legal rights and were motivated by evil intent.

## **PRAYER FOR RELIEF**

WHEREFORE, Ms. Border respectfully requests the following relief:

A.   Declare that Defendant's acts or omissions violated the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*; the Pregnancy Discrimination Act, 42 U.S.C. § 2000e *et seq.*; the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; the D.C. Human Rights Act, D.C. Code § 2-1401.01 *et seq.*; the D.C. Family and Medical Leave Act, D.C. Code § 32-501 *et seq.*; and the Protecting Pregnant Workers Fairness Act of 2014, D.C. Code § 32-1231.01 *et seq.*;

B.   Enter an award of compensatory damages in an amount to be determined at trial;

C.   Enter an award of punitive damages in an amount to be determined at trial;

D. Enter an award of back pay in the amount of any wages, employment benefits, or other lost compensation, including but not limited to Ms. Border's full 2017 and 2018 target bonuses, her long-term incentive package, interest on back pay, and compensation for any special damages sustained as a result of the Defendant's unlawful actions;

E. Enter an award of liquidated damages in the amount of the total lost compensation and interest owed to Plaintiff;

F. Enter an award of consequential damages equal to three times the amount of total lost compensation and interest owed to Plaintiff;

G. Order Defendant to pay the appropriate civil penalty pursuant to D.C. Code § 32-1231.11;

H. Enter an award of reasonable litigation costs, expert fees, and attorneys' fees; and,

I. That the Court grant any other such relief the Court may deem just and equitable, and as the nature of this case may require.

## **JURY TRIAL DEMANDED**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and pursuant to the local rules of this Court, Plaintiff demands a jury trial for this action.

Respectfully Submitted,

_____
Cori Cohen, Bar No. MD19124
Marlene S. Ailloud, Bar No. 1027951
Shannon C. Leary, Bar No. MD18396
Gilbert Employment Law, P.C.
1100 Wayne Avenue, Suite 900
Silver Spring, Maryland 20910
Tel: (301) 608-0880; Fax: (301) 608-0881
ccohen@gelawyer.com
mailloud@gelawyer.com
sleary@gelawyer.com
*Counsel for Plaintiff*